77 N.J. Super. 99 (1962)
185 A.2d 420
ST. CASSIAN'S CATHOLIC CHURCH, MONTCLAIR, NEW JERSEY, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
JOSEPH ALLEN, INSPECTOR OF BUILDINGS OF THE TOWN OF MONTCLAIR, IN THE COUNTY OF ESSEX, AND THE BOARD OF ADJUSTMENT OF THE TOWN OF MONTCLAIR, IN THE COUNTY OF ESSEX, A MUNICIPAL CORPORATION OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided October 26, 1962.
*102 Mr. Vincent J. Joyce, for the plaintiff (Messrs. Joyce and Brown, attorneys).
Mr. Samuel Allcorn, Jr., Town Counsel, attorney for the defendants.
LABRECQUE, J.S.C.

INTRODUCTION
This proceeding in lieu of prerogative writs was originally instituted to review the action of the defendant Board of Adjustment of the Town of Montclair denying the application of the plaintiff church to eliminate a condition limiting the enrollment of St. Cassian's School. The limitation had been imposed by the then board of adjustment when construction of the school was authorized in 1951. Both parties moved for summary judgment, and on January 10, 1962, while motions *103 were pending, chapter 138 of the Laws of 1961 was approved by the Governor and became operative. N.J.S.A. 40:55-33.1. Thereafter, a supplemental complaint was filed adding the second and third counts which asserted, in effect, that since the enrollment limitation was not imposed upon public schools in the community, its imposition on St. Cassian's was rendered illegal by virtue of the statute. By these counts it sought the issuance of a certificate of occupancy, notwithstanding the enrollment limitation. In their answer the defendants challenge the constitutionality of the statute. Alternatively, they assert that a subsequent amendment to the zoning ordinance, excluding public schools, constitutes full compliance with the statute. The plaintiff challenges the right of the town to exclude public schools and urges that the limitation which the defendant zoning board had imposed comes within the statutory prohibition and was not reinstated by the ordinance amendment excluding public schools in futuro.
There being no substantial dispute as to the facts, the matter was submitted on the record below, the 1951 record, affidavits and briefs supplemented by oral argument.

FACTS
The plaintiff is a religious corporation. Its place of worship and school are located on premises at the corner of Lorraine and Norwood Avenues, Montclair, in an area which was zoned as R-3 (garden group) in 1951. At the time of the decision under review, however, it was zoned as R-1 (single-family residences). Most, if not all, of the remainder of the block in which its property is located, is zoned as R-2 (two-family zone) and C-1 (general business zone). The block is a rather large one and adjoins the upper Montclair business zone. It extends from Valley Road on the north to Norwood Avenue on the south, and from Bellevue Avenue to Lorraine Avenue. Valley Road, which closely parallels the tracks of the Greenwood Lake Division of the Erie-Lackawanna Railroad *104 at this point, is zoned for business up to Lorraine Avenue on both sides. Continuing around the block, all of the opposite side of Lorraine Avenue, except that portion facing Norwood Avenue, is zoned as R-2 or C-1. The opposite side of Norwood Avenue is zoned as R-1, but is and has been occupied by the Mount Hebron School, a public elementary and junior high school. The entire opposite side of Bellevue Avenue is zoned as C-1 or R-3. The plaintiff's school is located at the corner of Lorraine and Norwood. To the east of it is the church, and immediately east of that is the public library. The playground is located to the rear or north.
Although plaintiff's place of worship has been located on the parcel in question for many years, its school was not constructed until 1951. In July of that year an application was made to the board of adjustment for permission to erect a two-story elementary school building consisting of eight classrooms, a kindergarten room and a combination gymnasium-auditorium. Under the zoning ordinance in effect at that time, the uses permitted in an R-3 Zone included:
(a) Any use permitted in an R-1 Zone.

* * * * * * * *
(e) * * * such philanthropic or eleemosynary uses or institutions other than correctional institutions and such hospitals, convalescent and nursing homes, psychiatric institutions and/or sanitariums as may be permitted by the Board of Arjustment after a hearing.
(f) Accessory uses customarily incident to the above uses.

* * * * * * * *
The use regulations controlling R-1 Zones at that time authorized any use permitted in R-O Zones. The latter permitted:
"(c) Schools, libraries or museums conducted by a governmental agency and such other schools, libraries or museums as may be permitted by the Board of Adjustment after a hearing." (Emphasis added.)
The board of adjustment, after two hearings, entered an order dated October 22, 1951 permitting the plaintiff to erect *105 the proposed school but imposing six conditions as a prerequisite to its doing so. Three of these, which were the subject of the current proceedings before the board, were as follews:
"3) That the said playground area be used for no purpose other than for an outdoor recreation area for the students of the contemplated school.
4) That no means of access shall be afforded at any time for motor vehicles to enter the playground area * * *

* * * * * * * *
6) That the enrollment of pupils in said school shall at all times be limited to the extent that for each pupil enrolled there shall be usable outside playground area of not less than one hundred (100) square ftet."
A building permit was subsequently issued, and the school was erected and has been in operation for some ten years.
On July 19, 1961 an application was filed by the church to eliminate condition number 6 above and to modify conditions 3 and 4 so as to permit accessory parking on the school playground at certain times. Prior to that time the plaintiff's property had been rezoned from R-3 to R-1. In the latter zone the use regulations authorized any use permitted in the R-O Zone and
"(d) On any property owned or leased by the Town of Montclair, any use for which it is operated by the Town of Montclair."
In the R-O Zones the only schools permitted were
Schools, libraries and museums operated by the Town of Montclair. (Section 6 (c))
The clause allowing other than public schools appears to have been eliminated in 1955 or thereabouts.
At a hearing held on August 10, 1961 it developed that for a number of years the school enrollment of St. Cassian's had exceeded the 280-pupil limit which had resulted from the condition that there be 100 square feet of playground space for each pupil in attendance. Father John Brown, the present *106 pastor, testified that he had not been pastor when the school was built and had not known of the limitation. He said that some 430 children were enrolled for the September 1961 term. This closely approximated the enrollment for the prior year. He testified that the population of the parish had more than doubled and that the demand for school facilities had increased accordingly. He described the use of playground space and testified that it was adequate for the use being made of it. He described the operation of the school and stated that the enforcement of the enrollment limitation would work a difficult hardship.
Another witness called was Dr. Henry T. Hollingsworth, an educational consultant and a former Superintendent of Schools at Bloomfield. His services in Bloomfield covered a period of 34 years. He was also chairman of a group of 16 which included superintendents of schools, school business managers, school architects and representatives of the State Department of Education, which was responsible for the Schoolhouse Planning and Guide Book published and issued by the State Board of Education (1956). In substance, he testified that the restriction in question was unreasonable, that the school had some 28,000 feet of playground area in use, and that this was adequate for the size of the school and its program. When questioned as to the Guide, which recommended as a site for new elementary schools a tract of five acres plus an additional acre for each 100 pupils, he stated that this was the desirable objective where land was available, but was not intended to be applied to built-up areas such as Newark, Montclair, Bloomfield or similar locations, and that in such communities it was not and could not be followed. He cited as an example a modern public elementary school recently constructed in Paterson, with virtually no playground area. His testimony concluded as follows:
"Q. Does the State of New Jersey require a minimum area for playgrounds? A. No.
Q. Never has? A. No, never. This Guide, which was developed in 1950, does not recommend anything.
*107 Q. You are familiar with St. Cassian's playground? A. Oh, yes.
Q. You looked at it? A. Yes.
Q. And you know there are 430 students there at St. Cassian's? A. Yes, sir.
Q. In your opinion, do you believe that a playground area which is approximately 28,000 feet, square feet, is sufficient to accommodate outdoor recreational facilities of those students? A. From the program they have at St. Cassian's, my answer would be yes, because they have more than the playgrounds in the public schools.
Q. Do you know whether that is because of the size of the area or because of the curriculum? A. On account of the curriculum, the  on account of the program they have." (Emphasis added.)
Mr. Alfred Bonney, a licensed real estate broker operating in the area, stated that real estate values had increased since construction of the school, that proximity to the school aided in the sale of property, and homes near the school were in demand. He further testified that on several occasions he had observed the playground when school was in session, and had never found it to be crowded or congested.
On the board's examination of Father Brown, it appeared that while the paved area of the playground was 28,000 square feet in area, there was 12,800 square feet of additional space which was not being used. This included the lawns in front of and to the side of the school building, and an area between the school and the church.
The above testimony was not contradicted and no one appeared in opposition to the application, although the board received in evidence two letters for what they are worth." Neither of these purported to present any facts bearing upon the reasonableness of the enrollment restriction based upon the playground area.
In its decision, dated October 2, 1961, the board recommended the elimination of conditions 3 and 4 of the original order so as to permit limited parking during non-school hours, but denied the application to eliminate condition 6. As to the latter, it found that the applicant had failed "to present any evidence whatever of any special reason" which would justify the elimination or removal of the condition, that the school could "properly accommodate no more than 280 pupils," *108 and that if the increased enrollment (430 pupils) was permitted to be continued, it would impair the intent and purpose of the zone plan and zoning ordinance of the town and would be a substantial detriment to the public good.
Chapter 138 of the Laws of 1961, which became operative on January 10, 1962, provided that:
"No planning or zoning ordinance heretofore or hereafter enacted by any municipality governing the use of land by, or for, schools shall, by any of its terms or provisions or by any rule or regulation adopted in accordonce therewith, discriminate between public and private day schools, not operated for profit, of elementary or high school grade."
It is not contended that the requirement of 100 square feet of playground space per pupil had been applied to public schools in the town. Nor does it appear that the Mount Hebron School, which is somewhat larger and directly across the street from St. Cassian's, has been required to furnish that amount of playground space per pupil.

I.
It is urged by the defendants that the present proceedings should be dismissed since the matter is res adjudicata by reason of the plaintiff's failure to appeal from the 1951 decision of the board of adjustment which imposed the enrollment restriction. The doctrine of res adjudicata has been held applicable to actions heard by a zoning board of adjustment. Home Builders Ass'n of Northern N.J. v. Paramus Bor., 7 N.J. 335, 342 (1951). But see Lubliner v. Board of Alcoholic Beverage Contract Paterson, 33 N.J. 428 (1960). However, in order to require invocation of the doctrine, more than the fact that the same owner and the same property are involved is necessary. The objectors, the defendants here, are required to show that the second application is substantially similar to the first, both as to the application itself and the circumstances of the property involved. Russell v. Tenafly Board of Adjustment, 31 N.J. 58, 65 (1959); Tzeses v. *109 Board of Trustees of South Orange, 22 N.J. Super. 45, 54-55 (App. Div. 1952); Mingle v. Board of Adjustment, Orange, 6 N.J. Misc. 595, 597, 142 A. 367 (Sup. Ct. 1928). The question to be determined, therefore, was whether there has occurred a sufficient change in the application itself or in the conditions surrounding the property to warrant consideration of the new application. The board apparently determined that there was, since it did not invoke the doctrine but afforded the plaintiff a full hearing. The rule enunciated in Russell v. Tenafly, supra, was not intended to be so immutable or definitive as to preclude such a determination. Cf. Stafford Smith v. Zoning Board, etc., of Madison, 59 N.J. Super. 553, 559 (App. Div. 1960). In any event, upon the passage of chapter 138, supra, the plaintiff became entitled to an adjudication as to its effect upon the prior restriction. Westinghouse Electric Corp. v. United Electrical, etc., 139 N.J. Eq. 97, 106 (E. & A. 1946); Roselle v. Wright, 37 N.J. Super. 507, 515 (Law Div. 1955); Trinity, etc., Church v. Board of Adjustment, Morris Plains, 72 N.J. Super. 425 (App. Div. 1962).
The board's decision in this regard is supported by uncontradicted testimony to the effect that there had been a substantial change in the conditions surrounding the property in that there had been an increase in the size of the parish and an increase in the Catholic population in Upper Montclair to the extent that it had more than doubled since the 1951 application. The demand for the church's educational facilities had increased accordingly, resulting in the increase in the school enrollment from the original 200 to 430 during the past two or more years. This phenomenon is consistent with the population growth and demand for increased school facilities which has been taking place in other areas in the State. It is extremely doubtful that the 1951 board of adjustment could have had these changes in mind at the time it made its decision. That there had been a change in some of the circumstances surrounding the property was apparently conceded *110 by the board's recommendation to modify the parking restrictions which had been previously imposed.
Accordingly, the failure to apply for judicial review of the 1951 decision which imposed the restrictions, did not preclude the present application to modify or eliminate them.

II.
Some confusion appears to exist as to the exact nature of the 1951 proceedings which authorized construction of the school. As has been noted above, the ordinance then in effect permitted public schools and "such other schools * * * as may be permitted by the Board of Adjustment after a hearing." The board's decision, dated October 2, 1951, granted "permission to erect and conduct an eight classroom, kindergarten, combination auditorium and gymnasium, fire-proof building on its property aforesaid * * *," subject to the six conditions referred to. Although the brief filed on behalf of the defendants refers to the action taken as the granting of a variance, it was, in effect, the granting of permission to use the premises for a purpose expressly provided for in the ordinance, a power which had been expressly committed to the board. Cf. Griggs v. Zoning Board of Adjustment, Princeton, 75 N.J. Super. 438 (App. Div. 1962).
Thereafter, plaintiff's premises were rezoned to R-1 and the school became a nonconforming use. The application which initiated the present proceedings was therefore treated as an application for a variance to permit the extension of a nonconforming use which required favorable recommendation by the board of adjustment to the municipal governing body as a prerequisite to favorable action by the latter. Section 32(p) (4) of the ordiance, which follows N.J.S.A. 40:55-39(d), authorizes such procedure for special reasons provided the use may be granted without substantially impairing the intent and purpose of the zone plan and zoning ordinance.
In the original complaint filed it was asserted that the findings of the board were arbitrary, capricious and unreasonable. *111 It is argued that the undisputed testimony of the increased Catholic population in the area and the increased demand for educational facilities adequately established the special reason required for elimination of the condition. See Andrews v. Ocean Twp. Board of Adjustment, 30 N.J. 245, 250 (1959). It is further urged that the board's finding that such occupancy, if continued, would be a substantial detriment to the public good and would impair the intent and purpose of the zone plan and zoning ordinance of the town, is at variance with the fact that through the pastor's ignorance of the prior restriction, the school actually served 430 pupils during two or more years preceding the hearing, and there was no proof adduced of any detriment to the surrounding area during that period. The issues thus presented became considerably narrowed, however, by the enactment of chapter 138 of the Laws of 1961 which, by its terms, proscribes discrimination between public and private day schools not operated for profit of elementary or high school grade. Trinity, etc., Church v. Board of Adjustment, Morris Plains, supra.
Defendants contend that the plaintiff does not qualify as a school "not operated for profit" which would be entitled to the benefit of the statute. It was stipulated that the affidavits of Father Brown should be considered by the court in lieu of testimony on this point. From them the conclusion is inescapable and the court finds that the school in question comes within the statutory definition.
Before proceeding to a determination of the effect of chapter 138 upon the present proceedings, we turn to consideration of the challenge to its constitutionality which is raised by the defendants. This is buttressed upon the contention that it constitutes special legislation which grants a privilege to a certain class by means of a classification which is discriminatory and not based upon substantial distinctions reasonably related to the subject matter of the legislation. U.S. Constit., Amend. XIV; N.J. Const. Art. IV, § VII, pars. 7, 8 and 9(8).
*112 Statutes dealing with zoning are subject to the same constitutional requirements and proscriptions as are all other statutes, and must comply with due process and equal protection of the law. Consequently, such legislation must be neither unreasonable nor arbitrary, and a rational relation must exist between the regulation and the service of the common well-being within the range of the statutory policy. Raskin v. Morristown, 21 N.J. 180, 194 (1956). As was said in Washington National Ins. Co. v. Board of Review, 1 N.J. 545, 553 (1949):
"While the due process and equal protection guaranties are not coterminous in their spheres of protection, equality of right is fundamental in both. Each forbids class legislation arbitrarily discriminatory against some and favoring others in like circumstances. It is essential that the classification itself be reasonable and not arbitrary, and be based upon material and substantial distinctions and differences reasonably related to the subject matter of the legislation or considerations of policy, and that there be uniformity within the class."
It is well established that the Legislature has a wide range of discretion in defining classifications, and distinctions will be presumed to rest upon a rational basis if there be any conceivable state of facts which affords reasonable support for them. Harvey v. Essex County Board of Freeholders, 30 N.J. 381, 390 (1959); Wilson v. Long Branch, 27 N.J. 360, 377 (1958); N.J. Restaurant Ass'n, v. Holderman, 24 N.J. 295, 300 (1957); cf. Gundaker Central Motors v. Gassert, 23 N.J. 71 (1956). The courts, in deciding the constitutionality of a statute, may not pass judgment upon the wisdom of the Legislature in enacting the law, but are confined to ascertaining if the Legislature has kept within its powers. Sarner v. Union Tp., 55 N.J. Super. 523 (Law Div. 1959); State v. Garden State Racing Ass'n, 136 N.J.L. 173 (E. & A. 1947).
Defendants urge that no valid distinction exists between private day schools operated for profit and those not so operated, and that the exclusion of the former from the statutory classification contravenes due process and equal protection. *113 They urge that students of the same ages and characteristics attend both types of schools, and that all other things being equal, the same amount of pedestrian and vehicular traffic is generated by both. It is also argued that the noise and other factors incidental to the operation of schools are equal in both and thus their total effect on the neighborhood is the same. It is well established, however, that it is not enough to demonstrate that the legislative objective might be fully achieved by a more expansive classification. Two Guys from Harrison, Inc. v. Furman, 32 N.J. 199 (1960). The Legislature may limit its action because of substantial considerations of public policy or convenience, or the service of the general welfare. DeMonaco v. Renton, 18 N.J. 352, 360 (1955); N.J. Restaurant Ass'n v. Holderman, supra, 24 N.J., at p. 300.
The question of whether the exclusion of private schools for profit from a classification which includes public and non-profit private schools for zoning purposes is arbitrary, has not been directly passed upon by our courts. However, in Yanow v. Seven Oaks Park, Inc., 11 N.J. 341 (1953), our Supreme Court had occasion to pass upon an ordinance which permitted in a zoned area public and parochial schools of a level of education necessary to meet the statutory requirements of compulsory education while excluding other schools. The court held that such a classification was reasonable and that the exclusion of other schools was justified on the ground that they constituted primarily a business use, whereas the schools in the cited classification were conducted for the primary purpose of educating the children of the community in those subjects or courses required under the statutes relating to compulsory education. While it might be urged that the court in this case was considering parochial schools without regard to whether they were operated for profit, the court's specific basis for upholding the distinction as reasonable supports the theory that a school operated for business purposes may be properly excluded.
*114 In Andrews v. Ocean Twp. Board of Adjustment, supra, the Supreme Court had occasion to consider the constitutional issue of whether the zoning treatment of public and parochial schools was required to be identical. It found it unnecessary to pass upon the question. In so doing it pointed out that a municipality could legislatively determine to include private and public schools in a single category for zoning purposes, as approved in Yanow, but that reasons existed which could well support the opposite approach. Our highest court having intimated that public and private schools both might and might not be logically included in the same classification, the inference was that the question was one for legislative determination. Andrews was decided June 30, 1959. Two years later, chapter 138 passed the Legislature. That the Legislature is presumed to be familiar not only with the statutory law of the State but also with the common law, is well established. Yanow, at p. 350. This being the case, the standard enunciated by Justice Sutherland in Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 118, 171 L.Ed. 303 (1926), could well apply:
"If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control."
See also Pierro v. Baxendale, 20 N.J. 17, 22 (1955).
Contrary to defendants' contention, valid distinctions may be found between private elementary and high schools operated for profit and those not so operated. The principal one is that the primary motive for the former's existence is business, the seeking of a profit, whereas the education of the children in a community is the sole motivating force of the latter. The defendants have failed to establish that the legislative classification is arbitrary or capricious or that it lacks a rational basis in relation to the specific objectives of the statute.
The defendants also contend that the statute in question *115 contravenes Art. IV, § VI, par. 2 of the New Jersey Constitution which provides:
"The Legislature may enact general laws under which municipalities, other than counties, may adopt zoning ordinances limiting and restricting to specified districts and regulating therein, buildings and structures, according to their construction, and the nature and extent of their use, and the nature and extent of the uses of land, and the exercise of such authority shall be deemed to be within the police power of the State. Such laws shall be subject to repeal or alteration by the Legislature."
It is urged that this constitutional provision limits the Legislature to the enactment of general statutes which authorize municipalities to zone, but in no way restrict or direct the exercise of municipal discretion. In other words, while the Legislature may generally authorize municipalities to classify uses in the adoption of zoning ordinances, any attempt on its part to so classify or to direct municipalities in their classification is an unconstitutional interference with the municipal regulatory power.
That defendants' thesis fails to find support in this constitutional provision is revealed by consideration of the legislative action in the light of the provision. Art. IV, § VI, par. 2, provides that "The Legislature may enact general laws under which municipalities * * * may adopt zoning ordinances * * *." This phrase contains the basic constitutional direction to the Legislature concerning the exercise of its police power in the zoning field. Roselle v. Wright, 21 N.J. 400, 408 (1956); Fischer v. Bedminster Township, 11 N.J. 194, 201 (1952). The remainder of the constitutional provision directs that ordinances adopted by municipalities, pursuant to the authority which they are granted by legislative enactment, shall provide for zoning by districts in which buildings shall be regulated according to their construction and the nature and extent of their use, and the nature and extent of the uses of land therein.
It has already been decided, supra, that chapter 138 is general and not special. As a general law it provides the *116 framework within which a municipality may zone by district and according to use. Consequently, it is consistent with the constitutional directive to the Legislature. The statute does not interfere with the discretion of a municipality to determine in which districts schools may be constructed and from which districts they should be excluded. The basic judgment concerning the uses for which a particular district is best suited remains with the municipality. The sole function of the statute is the abolishment of a distinction between the treatment accorded the two types of schools, which distinction the Legislature has determined to be unduly discriminatory. This is accomplished by providing that after a municipality has decided a school use is suitable in a particular district which it has zoned according to the use of lands and buildings therein, the municipality may not discriminate between public schools and nonprofit private day schools of the elementary and high school level. It is obvious that the Legislature does not interfere with municipal discretion but confines itself to general legislation. That a legislative body in the exercise of its powers may make such classification as it deems necessary is well established. Zullo v. Board of Health, Woodbridge Twp., 9 N.J. 431, 439 (1952). A municipality cannot assume to itself authority to interfere through its ordinance with those uses which receive legislative protection. State v. Accera, 36 N.J. Super. 420, 425 (App. Div. 1955); cf. Stoker v. Irvington, 71 N.J. Super. 370, 378 (Law Div. 1961), and cases cited therein.
Defendants futther contend that even if the statute is found to be constitutional, it is ineffective here because there is no discrimination against the plaintiff's school. The first contention is that if the ordinance provisions prior to their amendment on February 20, 1962 discriminated at all, the discrimination was between public schools and all private schools and hence not within the specific interdict of the statute. The defendants cannot justify discrimination of the type proscribed by the statute on the ground that other discrimination, not so proscribed, also exists. Such a contention *117 overlooks the basic legislative policy determination which resulted in the classification herein. The evil which chapter 138 was enacted to overcome is that which defendant urges as neutralizing the discrimination of which plaintiff complains.
Defendants' second contention is that the effect of chapter 138 was to bring about the immediate excision of all provisions in the ordinance permitting public schools while excluding nonprofit private schools. As a result, they assert, there is no discrimination since neither public nor private schools are permissible uses in the district. To give effect to this interpretation of the statute would render the Legislature's attempt to end discrimination by ordinance, "heretofore or hereafter enacted," an exercise in futility. As a consequence, all municipal ordinances which offend the statute would be struck from the rolls and the evil which the statute sought to remedy would be frozen. Thus, a discriminatory situation already in existence would remain in a status quo and without remedy. In order to effectuate the Legislature's intention, the court does not interpret the statute as exscinding all ordinance provisions which permit only public schools, but rather as permitting the erection of nonprofit private schools in an area in which and under the same conditions as public schools would be permitted.
Finally, the defendants urge that the question of the existence of discrimination which violates the statute has been rendered moot by the enactment, on February 20, 1962, of an amendment to the ordinance eliminating public schools as a permitted use in any zone in the town. The court takes no position on the right of the municipality to negate the statute in this manner. Even if its validity be assumed, its only effect would be to prohibit the future construction of new schools. But the discrimination here charged stems from the enforcement of a prior rule or regulation which would continue to be in violation of the statute notwithstanding the amendatory ordinance.
Having in view the requirements of chapter 138, *118 the court finds that there is no reasonable basis for the distinction in treatment afforded plaintiff's school as contrasted with that afforded public schools. It is fair to say that any community has a strongly presumptive need for elementary schools, whether public or parochial. Trinity, etc., Church v. Board of Adjustment, Morris Plains, supra, at p. 430. It is likewise well established that the use of property for school purposes is presumably in furtherance of the general welfare. Andrews v. Ocean Twp. Board of Adjustment, 30 N.J. 245, 251 (1959). If it be assumed that the requirement of 100 square feet of playground space per pupil was imposed for one of the purposes set forth in R.S. 40:55-32, it is not shown that the operation of the plaintiff's school would work any greater harm than that which would ensue from the operation of the average public school in the vicinity. It is urged by the defendants that prevention of the overcrowding of land and buildings, referred to in the statute, justifies the restriction. But such overcrowding, if established, would be no greater than that met with in the case of a public school. As a practicality, congestion in the streets would be no more nor would the danger of fire or panic or to health or morals be any greater.
In the case at bar the limitation which was applied to plaintiff's school was not applied to any other school, public or private. It is significant that in this R-1 Zone and directly across the street from plaintiff's school a much larger public school, while subject to the same surrounding conditions and circumstances as plaintiff's, has not been limited by a similar playground condition. The court finds that this condition is one which chapter 138 proscribes as discrimination by "rule or regulation." Under the statute such land use regulation imposed under a zoning ordinance cannot impinge more onerously on private day schools not operated for profit than on public schoils. Trinity Evangelical Lutheran Church v. Board of Adjustment, Morris Plains, supra, at p. 432.
The condition restricting the enrollment of the plaintiff's *119 school to one pupil for each 100 square feet of playground space is discriminatory and in contravention of chapter 138, Laws of 1961. Accordingly, the action of the Board of Adjustment of the Town of Montclair is reversed and the building inspector is directed to issue a certificate of occupancy without limitation based upon playground area.
The conclusions thus reached render it unnecessary to determine whether the board's action was arbitrary, capricious or unreasonable in the absence of the statute, and whether the board properly restricted the usable playground area to the paved portion thereof.
Counsel may submit an order in accordance with this decision.